## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 29 2016, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Douglas R. Cutter,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

June 29, 2016

Court of Appeals Case No.
15A01-1512-CR-2288

Appeal from the Dearborn
Superior Court

The Honorable Jonathan N.
Cleary, Judge

Trial Court Cause No.
15D01-1506-F5-42

**Brown, Judge.**

[1] Douglas R. Cutter appeals his sentence for dealing in a narcotic drug as a level 5 felony and conspiracy to deal in a narcotic drug as a level 5 felony. Cutter raises one issue which we restate as whether his sentence is inappropriate in light of the nature of the offense and the character of the offender. We affirm.

*Facts and Procedural History*

[2] In June 2015, a detective with the Lawrenceburg Police Department served in an undercover role at Proximo, at the company's request, due to the presence of drug activity. Cutter worked for a placement service which provided workers for Proximo's warehouse. On June 1, 2015, the undercover detective "went into [a] Proximo warehouse as . . . an employee from out of town." Transcript at 25. On June 3, 2015, he was working third shift and became acquainted with Cutter. The detective told Cutter that he had been experiencing back pain, that he was working at Proximo as an out of town employee, and that he had been to a doctor and had been prescribed hydrocodone, and Cutter replied that he should have been prescribed oxycodone and that Cutter could supply him with ten milligram tablets of oxycodone.

[3] During the first break during the shift, Cutter provided the detective with his phone number, stated that his wife currently had his phone, and asked to use the detective's phone to contact his wife. Cutter asked his wife for a phone number of one of his suppliers by name. Cutter then contacted the supplier to see if he had ten milligram tablets of oxycodone available for sale, the supplier indicated he did and that the cost would be ten dollars per tablet, the detective said that he would purchase as many as five tablets for a total of fifty dollars,

and Cutter related the message to the supplier during the call.

[4] The detective and Cutter continued to work their shift and talk to each other. Cutter talked about other suppliers of controlled substances that he had, and he eventually indicated that he had heroin and could supply the detective with heroin. Cutter stated he had spent a lot of money on pain medication in the past, but "that now he had turned to, what is known as dog, [] a street term for heroin, because it was much cheaper, and that he could provide [the undercover detective] with heroin." *Id.* at 28. After completing their shift, the detective continued to maintain contact with Cutter through the next day via text messages and phone calls, and Cutter later told him that "his supplier of oxycodone had backed out. . . ." *Id.* at 29. At that point, the detective asked Cutter if he had any heroin, and Cutter responded affirmatively and agreed to sell him heroin.

[5] Prior to beginning their shift the next night, the detective traveled to Cutter's residence in Lawrenceburg, picked him up, and then traveled to Proximo's parking lot. After they arrived, Cutter handed the detective a folded piece of paper containing heroin, the detective asked him how much he wanted for it, and Cutter "said fifteen dollars." *Id.* at 30. The detective gave Cutter twenty dollars with the expectation that Cutter would owe him five dollars at some point.

[6] The following day, the detective continued to have contact with Cutter, and Cutter advised that he could retrieve more heroin for him and "suggested that

[he] purchase fifty dollars worth," and the detective agreed. *Id.* at 30. The detective reminded Cutter he owed him five dollars, and Cutter stated that he "would make the amount of the heroin correct so that it would be five dollars more, five dollars in addition to the fifty dollars worth." *Id.* at 31. The detective worked a shift at Proximo, later contacted Cutter and told him he was traveling to McDonalds on his lunch break, and Cutter said he would meet him there. When Cutter arrived, his wife and one of his sons were in his vehicle. Cutter handed the detective a piece of paper with heroin in it and said that it was better than the heroin he delivered the previous day and to use just a small amount. The detective handed Cutter fifty dollars. Several days later, Cutter contacted the detective by text message, stating "I'm making a run, you need any or are you good." *Id.* at 32. Cutter later sent another text message to the detective, and the detective stated "yes, I'm fine" and that he "may not be working there any longer." *Id.*

[7] The detective obtained the phone records of the phone number Cutter had provided and discovered text messages between Cutter and his supplier "just prior to when [the undercover detective] first met [Cutter]" on June 3, 2015. *Id.* One of the messages from Cutter's phone stated "I get you more business, just look out for me," and there was a reply message which stated "every new person you bring to me I will look out for you." *Id.* at 33.

[8] On June 16, 2015, the State charged Cutter with: Count I, dealing in a narcotic drug (heroin) as a level 5 felony; and Count II, conspiracy to deal in a narcotic

drug (heroin) as a level 5 felony.[1]  On October 28, 2015, Cutter pled guilty to the charges.  At sentencing, the undercover detective testified to the foregoing and that, throughout their conversations, Cutter "complained to [him that] law enforcement was very strict in this area, had zero tolerance for illegal drug activity" and that he was "just making [him] aware of all that."  *Id.* at 34. Cutter testified that he worked third shift at Proximo and that he worked a second job during the day trimming trees, and he testified he previously worked at a gravel pit for eleven years.  He stated he had five grown children and five grandchildren and that he is a drug addict.  He testified he was in a motorcycle accident in about 1986 or 1987, that he stayed on pills for probably eight years, that he lost his job and insurance and could not afford to see a doctor, and that he started buying the pills from the street.  He testified that he eventually purchased heroin because it was cheaper, that he did enough just to cure his pain, and that he continued to work.  He further indicated that his wife was one of the co-defendants in this case and that he has not spoken to her since they were arrested.  When asked by the prosecutor if he was the one that suggested heroin, Cutter stated "[y]ea, I suggested it to him, that I could get it, yea."  *Id.* at 53.  When asked "[y]ou also indicated to probation that you thought that this whole instance [sic] offense was brought on by your wife, both dropping dirty at the probation department," Cutter answered "I'm thinking maybe that's why

---

[1] Cutter's wife and one of his sons were also named defendants in the charging information.  Cutter's wife was charged with the same counts as Cutter, and Cutter's son was charged with attempted dealing in a narcotic drug (oxycodone).

the charged with me [sic], because she lived with me so." *Id.* at 54. Cutter stated that he was very sorry for what he did.

[9] The court noted Cutter's previous convictions and probation violations. The court stated that it considered the fact Cutter pled to the mercy of the court as a mitigating factor. It rejected that he was likely to respond to probation or short term imprisonment, that he is unlikely to commit another crime, or that imprisonment would result in undue hardship on him or his dependents. The court also noted that, based upon his experience on probation, Cutter was well aware of the potential consequences, that Cutter's culpability was high, and that Cutter saw the detective for a very short period of time and yet allegedly traveled to Cincinnati to obtain heroin to give him, showing that Cutter was willing to deal heroin to essentially a complete stranger. The court also noted that "originally the conversation was pills and [Cutter] escalated this to a heroin deal." *Id.* at 72. Cutter was sentenced to five years on Count I and to a concurrent five years on Count II.[2]

## *Discussion*

[10] The issue is whether Cutter's sentence is inappropriate in light of the nature of the offenses and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial

---

[2] The court stated that Cutter's wife "was involved in apparently the driving" and had received a sentence of six years, all suspended, and that Cutter's twenty-two year old son had received a sentence of six years with five years suspended. Transcript at 72.

court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Relief is available if, after due consideration of the trial court's sentencing decision, this court finds that in our independent judgment, the sentence is inappropriate in light of the nature of the offense and the character of the offender. *See Hines v. State*, 30 N.E.3d 1216, 1225 (Ind. 2015). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Id.* (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)). "[A]ppellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell*, 895 N.E.2d at 1225. "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Hines*, 30 N.E.3d at 1225 (quoting *Cardwell*, 895 N.E.2d at 1224).

[11] Cutter asserts that an undercover police officer "pretended to be a dope-sick fellow addict, prompting Cutter to offer him narcotics and heroin," that "[w]hile Cutter's choice was clearly illegal, his motivation did not spring from a desire to profit," and that "[r]ather he saw someone experiencing opiate withdrawals and felt the need to help." Appellant's Brief at 7. He further

argues that he is an addict whose problem began in the 1980s following a motorcycle accident, that his pain pill addiction morphed into a problem with heroin, that "[t]he fact that his criminal past has been so heavily influenced by his addictive personality illustrates why he would have acted as he did when the undercover cop complained of drug withdrawal symptoms," and that his character "is more appropriately shown through his attitude toward his fellow man rather than a recitation of his criminal history." *Id.* at 9.

[12] The State maintains the sentence imposed by the court is not inappropriate, that Cutter has violated probation, has a criminal history including felony convictions for drug crimes, and has had numerous opportunities to act in accordance with the law and to abstain from drug use but has failed to do so. It argues that Cutter's motivation to commit the crimes was not altruistic or simply an effort to look after a sick friend, that he exchanged text messages with a supplier prior to meeting the undercover detective, he encouraged the detective to buy more heroin in the second transaction and to make a third purchase, and that the evidence suggests Cutter was engaged in frequent drug transactions and stood to benefit personally from doing so. The State notes that Cutter sold heroin to the undercover detective twice, made an unsolicited offer to sell him heroin on a third occasion, and involved his wife and son in the transactions.

[13] With respect to the nature of the offenses, the record reveals that Cutter indicated that he could supply the detective with heroin, that the detective later asked Cutter if he had heroin and Cutter agreed to sell him heroin, and that Cutter sold

heroin to the detective for fifteen dollars. Cutter subsequently suggested that the detective purchase fifty dollars of heroin, the detective traveled on his break to meet Cutter, when Cutter arrived his wife and his son were in his vehicle, and Cutter sold heroin to the detective for fifty dollars. Cutter later contacted the detective by text message offering to obtain additional heroin for him.

[14] With respect to Cutter's character, we note that he pled guilty to two counts of dealing in a narcotic drug as level 5 felonies. The presentence investigation report ("PSI") states that he reported that his marriage is "pretty good" but "believes his wife brought the instant offense on him by 'dropping dirty at the probation department.'" Appellant's Appendix at 87. The PSI states Cutter was born on July 26, 1963, that he is married and the father of five adult children, and that he considers himself to be an addict. Cutter reported that he received drug and alcohol counseling in the Dearborn County Law Enforcement Center when offered, that he first consumed alcohol when he was sixteen years old and started drinking every day until he was eighteen years old, that when he was twenty-eight he began to smoke marijuana daily for one year, at age forty-five he snorted cocaine a few times, he was prescribed hydrocodone for a shoulder injury, he was addicted to the pills so he began purchasing them off the street, he began using ten dollars of heroin every day, and that he was in a motorcycle accident where he sustained multiple injuries and heroin helped curb the pain. The PSI further states that Cutter accepted accountability for his actions but disagreed with the charge of dealing and that he was the one that was approached and provoked by an undercover person.

[15] In addition, the PSI indicates that Cutter's criminal history includes convictions for burglary as a class C felony in 1982, for which he was sentenced to five years incarceration with one year suspended and four years reporting probation; operating a vehicle with an alcohol concentration equivalent to at least .08 but less than .15 and possession of marijuana as class D felonies in 1990; reckless driving, filed in 1996; public intoxication as a class B misdemeanor in 2010; visiting a common nuisance as a class B misdemeanor in April 2013, for which the court ordered a suspended sentence and probation and later revoked 120 days of the suspended sentence after a positive drug screen and intoxication; and receiving stolen property as a class D felony in December 2013, for which he was sentenced to 1,095 days with 730 days suspended to reporting probation, 180 days of which was suspended following a positive drug screen. The PSI provides that Cutter's overall risk assessment score using the Indiana Risk Assessment System places him in the high risk to reoffend category.

[16] After due consideration and in light of Cutter's criminal history and previous probation revocations, we conclude Cutter has not met his burden of establishing that his aggregate sentence is inappropriate in light of the nature of his offenses and his character.

## *Conclusion*

[17] For the foregoing reasons, we affirm Cutter's aggregate five-year sentence for dealing in a narcotic drug and conspiracy to deal in a narcotic drug as level 5 felonies.

Affirmed.

Baker, J., and May, J., concur.